Andrew M. Calamari
Sanjay Wadhwa
Sheldon L. Pollock
Kevin McGrath
Kristin M. Pauley
Ann Marie Preissler
*Attorneys for Plaintiff*
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Phone:  (212) 336-0533 (McGrath)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | Civil No. |
| | : | |
| -against- | : | Jury Trial Demanded |
| | : | |
| JAMES R. TROLICE, | : | |
| LEE P. VACCARO, and | : | |
| PATRICK G. MACKARONIS, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("Commission") alleges the following against defendants James R. Trolice ("Trolice"), Lee P. Vaccaro ("Vaccaro"), and Patrick G. Mackaronis ("Mackaronis") (together, "Defendants"):

## SUMMARY OF THE ALLEGATIONS

1.      This case involves a scheme orchestrated by Trolice and Vaccaro, from June 2009 through September 2014, to defraud investors by offering and selling interests in four limited liability companies that Trolice or Vaccaro owned and controlled:  Trolice Consulting Services,

LLC ("Trolice Consulting"), Vaccaro Consultant, LLC ("Vaccaro Consultant"), Vacaro Consultants, LLC ("Vacaro Consultants"), and Vaccaro Consultants, LLC ("Vaccaro Consultants") (collectively, the "LLCs").

2.      Trolice and Vaccaro represented to investors that the LLCs held warrants to purchase the common stock of a technology start-up company called eAgency, Inc. ("eAgency"). Trolice and Vaccaro created a sense of urgency and exclusivity around the offerings by telling investors that there were only a limited number of warrants available and that when eAgency achieved a purportedly imminent liquidity event (i.e., being acquired at a share price representing a high multiple over the exercise price of the warrants), the warrants to purchase eAgency's stock allegedly owned by the LLCs could be exercised at a very profitable price, thereby generating a high return for investors in the LLCs.

3.      During the relevant time period, Defendants raised more than $6 million for the LLCs from over 100 investors residing nationwide.  Although the LLCs did own some eAgency warrants at times during this time period, Trolice and Vaccaro were never authorized to sell those warrants to third parties and the warrants expired over time unbeknownst to the investors. Trolice and Vaccaro misappropriated all of the funds raised from investors for their own personal benefit and the investors in the LLCs have lost their entire investments.

4.      The fraudulent scheme at the center of this case involved brazen misrepresentations to investors.  Trolice and Vaccaro falsely represented to investors that purchasing an interest in one of the LLCs was the only way to participate because eAgency was no longer accepting direct investments.  However, Trolice and Vaccaro each knew that this was not true, as they were both engaged by eAgency at the time as consultants and "finders,"

2

responsible for soliciting accredited investors for direct investments in eAgency.[1]  Trolice and

Vaccaro additionally misrepresented to prospective and current investors in the LLCs:  (a) the

existence, number, validity, and term of eAgency warrants purportedly owned by the LLCs; (b)

their associations with eAgency; and (c) falsely stated that they received no compensation for the

sale of investments in the LLCs.

5.      Trolice lured investors in with his apparent wealth, hosting elaborate investor

parties at his multi-million dollar home in New Jersey, and purported track record of bringing

start-up companies public with resulting high returns for investors.  Trolice also misrepresented

to investors his "skin in the game" (i.e., the amount of money he had personally invested in

eAgency) and the amount of money he had raised for eAgency, which fostered confidence

among prospective investors in the investment.

6.      Vaccaro likewise made material misrepresentations to investors.  For example, he

told a prospective investor that eAgency's patents and intellectual property had been valued at

$300 million by an outside firm when, in fact, no such valuation was ever performed.  This

representation was significant for that investor because it signaled eAgency's future success.

7.      Mackaronis, a former broker, also played a direct role in the fraudulent scheme.

Mackaronis, after making a $9,000 investment in Trolice Consulting in February 2011, solicited

his family members, friends, and customers for investments in Trolice Consulting, earning

$85,000 in commissions.  In so doing, Mackaronis hyped the investment opportunity to

prospective investors, sold them on Trolice's business acumen, and brought prospective

investors to meet Trolice and Vaccaro so they could close the sales.  Mackaronis, however,

---

[1] In the business world, the term "finders" is generally used for persons (individuals or
organizations) who, for a fee, solicit financial investors or potential new employees for a
business entity, or provide other similar services that materially benefit the business entity.

ignored several red flags about the investment when convincing prospective investors to make investments in Trolice Consulting and knew very little about eAgency or the warrants purportedly held by Trolice Consulting.

8.     Vaccaro was also involved in an additional fraudulent scheme, related to the eAgency warrant fraud.  In that scheme, Vaccaro raised approximately $675,000 from several individuals who entrusted him to invest in securities on their behalf from November 2012 through July 2015, continuing to hold himself out as an investment adviser even after he was the subject of civil and criminal investigations.  Vaccaro defrauded these individuals by misrepresenting the investments he would make on their behalf and how their accounts were performing, and by misappropriating their funds.

## VIOLATIONS

9.     By virtue of the conduct alleged herein, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:

10.    Trolice and Vaccaro violated:

- Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act")  [15 U.S.C. §§ 77e(a), 77e(c)];

- Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)]; and

- Sections 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], or, in the alternative, Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)],

for aiding and abetting each other's violations of Sections 17(a) of the

Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.     In addition, Vaccaro violated Sections 206(1) and 206(2) of the Investment

Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)].

12.     Mackaronis violated:

- Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)];

- Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; and

- Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

13.     Unless the Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, transactions, and courses of business set forth in this Complaint and

in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to authority conferred by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C.

§ 78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. §§ 80b-9(d)], seeking a final

judgment: (a) restraining and permanently enjoining each of the Defendants from engaging in

the acts, practices and courses of business alleged against them herein; (b) ordering each of the

Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts,

including an order holding Trolice and Vaccaro jointly and severally liable for each other's ill-

gotten gains in connection with the offering fraud involving eAgency warrants purportedly held

by the LLCs; (c) imposing civil money penalties on each of the Defendants pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(e)]; and (d) issuing an officer and director bar against Trolice and Vaccaro pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d),77v(a)]; Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9, 80b-14].

16.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], Section 27 of the Exchange Act [15 U.S.C. §78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Many of the acts, practices, events, transactions, communications, courses of business and other matters alleged herein occurred in the District of New Jersey, including misrepresentations made to investors and misappropriation of investor funds.  Moreover, (a) Trolice and Mackaronis reside in the District of New Jersey and/or resided there during the relevant period; and (b) Trolice Consulting has its principal place of business in the District of New Jersey.

17.    In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

**DEFENDANTS**

18.    **Trolice**, age 62, resides in Alpine, New Jersey.  Trolice is the president and owner of Trolice Consulting and a manager of Vaccaro Consultants.  Trolice served as the President and Chief Marketing Officer of eAgency from May 2006 to February 2007.  Between May 2006 and December 2013, Trolice also served as a consultant and finder for eAgency pursuant to

various written agreements.  Trolice has never been registered with the Commission in any capacity nor associated with any registered entity.

19.     **Vaccaro**, age 44, is a resident of Las Vegas, Nevada.  Vaccaro was the Chief Marketing Officer and Vice President of Investor Relations for eAgency from July 2009 through October 2013, as well as a consultant and finder for eAgency pursuant to various written agreements.  In addition, Vaccaro is a manager of Vaccaro Consultants and Vaccaro Consultant. Vaccaro has never been registered with the Commission in any capacity nor associated with any registered entity.

20.     **Mackaronis**, age 32, is a resident of New York, New York, and, during parts of the relevant period, resided in Jersey City, New Jersey.  Mackaronis previously passed the Series 7 and 63 examinations and was a registered representative for several registered broker-dealers prior to August 2012.

## RELEVANT ENTITIES

21.     **Trolice Consulting** is a New Jersey limited liability company that has its principal place of business in Alpine, New Jersey.  Trolice Consulting and its securities are not registered with the Commission in any capacity.

22.     **Vaccaro Consultant** is a Nevada limited liability company that has its principal place of business in Laguna Beach, California.  Vaccaro Consultant and its securities are not registered with the Commission in any capacity.

23.     **Vacaro Consultants** was a Nevada limited liability company that had its principal place of business in Las Vegas, Nevada.  Vacaro Consultants and its securities were not registered with the Commission in any capacity.

24.     **Vaccaro Consultants** is a Nevada limited liability company, currently in default,

that has its principal place of business in Laguna Beach, California. Vaccaro Consultants and its securities are not registered with the Commission in any capacity.

## FACTS

**Overview of Trolice's and Vaccaro's Associations with eAgency**

25.    eAgency is a privately held firm that had developed and was marketing software applications for business and personal use on mobile devices. Trolice began working for eAgency in May 2006 as President and Chief Marketing Officer, positions he held until February 2007. During this period, and continuing through December 2013, eAgency also engaged Trolice as a consultant and finder through Trolice Consulting, and Trolice was responsible for introducing accredited investors to eAgency as prospective investors and negotiating the terms of their investment contracts with eAgency.

26.    eAgency compensated Trolice for his work as a consultant and finder in warrants, issuing 100,000 warrants to Trolice on October 16, 2007, and issuing additional warrants to Trolice over the next several years, ultimately reaching a maximum of 176,499 warrants on April 12, 2010. Warrants are derivative securities that give the holder the right to purchase eAgency common stock at a specific price within a certain time frame. If not exercised within that time frame, the warrants would expire. The warrants eAgency issued to Trolice began expiring in October 2013, and by April 12, 2014, all of Trolice's warrants had expired. The warrant subscription agreements required eAgency's approval of any transfer or sale of the warrants.

27.    Vaccaro was retained by eAgency in July 2009 to serve as its Chief Marketing Officer, a position he held through July 2011. Thereafter, he became Vice President of Investor Relations, a position he held through October 2013. eAgency also engaged Vaccaro as a consultant and finder through various limited liability companies Vaccaro had created and

8

controlled.

28.    eAgency compensated Vaccaro for his work as a finder and consultant in warrants issued to these limited liability companies. Vaccaro received the compensation as follows:

a)    eAgency issued 167,079 warrants to Company A, an entity Vaccaro owned and controlled, on July 28, 2009, which were set to vest in equal amounts over four years.

b)    On January 1, 2010, eAgency cancelled the 167,079 warrants previously issued to Company A, none of which had vested, and re-issued the 167,079 eAgency warrants to Vaccaro Consultants. The warrants vested in equal 25% installments over four years beginning on August 1, 2010.

c)    eAgency issued Vaccaro Consultants an additional 172,921 warrants on July 18, 2011, which also vested in equal 25% installments beginning on August 1, 2010, which, along with the 167,079 warrants issued to Vaccaro Consultants, collectively granted Vaccaro warrants for the purchase of 340,000 shares.

d)    On July 14, 2012, eAgency terminated its consulting agreement with Vaccaro Consultants and entered into a new agreement with Company B, another entity controlled by Vaccaro. In conjunction with the agreement with Company B, eAgency cancelled the warrants previously issued to Vaccaro Consultants and re-issued the warrants to Company B, entitling Company B to purchase 340,000 shares of eAgency stock during the period August 15, 2012 until August 1, 2019.

e)    On November 25, 2013, eAgency cancelled 320,000 warrants owned by Company B, leaving a balance of 20,000 warrants, valid until August 1, 2019.

**Fraudulent Offering of the LLC Securities**

Background on the Fraudulent Scheme

29.     Beginning in 2009 and continuing through September 2014, Trolice and Vaccaro

embarked upon an elaborate scheme to defraud investors by offering and selling interests in the

LLCs.  Trolice and Vaccaro represented to investors that the LLCs held eAgency warrants and

that when eAgency achieved a purported imminent liquidity event (i.e., being acquired at a share

price representing a high multiple over the exercise price of the warrants), the warrants to

purchase eAgency's stock ostensibly owned by the LLCs could be exercised at a very profitable

price, thereby generating a high return for investors in the LLCs.

30.     To solicit investors for the LLCs, Trolice and Vaccaro made oral and written

misrepresentations concerning the existence, number, validity, and term of eAgency warrants

purportedly owned by the LLCs.  However, most of the eAgency warrants purportedly

transferred by Vaccaro to the LLCs had never been issued or had never vested.  Even where the

warrants had been validly issued, any transfer or sale of the warrants was invalid without prior

approval by eAgency, and such approval was never granted, or even requested.  And although

eAgency did issue a limited number of valid warrants to Trolice and Vaccaro as compensation,

the dollar amount of interests Trolice and Vaccaro sold in the LLCs far exceeded the dollar

amount of valid warrants held by the LLCs.

31.     In addition, Trolice and Vaccaro created and used numerous forged documents

purporting to reflect the issuance of warrants to entities controlled by Vaccaro, and the transfer

of those warrants to, among others, Trolice Consulting.

32.     Trolice and Vaccaro have since pocketed all of the investors' funds for their own

personal benefit.  Moreover, neither Trolice nor Vaccaro was registered as a broker or dealer or

associated with a registered broker or dealer while soliciting investments for the LLCs and handling investors' funds.

### The "Vaccaro Consultant" Fraudulent Scheme

33.     On March 3, 2010, Vaccaro created Vaccaro Consultant, a limited liability company for which he and Trolice solicited and raised approximately $247,500 from several investors, some of whom reside in New Jersey, in April 2010.

34.     Vaccaro forged a warrant, purportedly entitling Vaccaro Consultant to purchase 250,000 eAgency shares, and created documents dated April 5, 2010 that transferred 99 percent interest in Vaccaro Consultant to approximately 6 investors.  Trolice solicited prospective investors for Vaccaro Consultant, luring them in with his apparent wealth and purported track record of bringing start-up companies public with resulting high returns for investors, and Vaccaro was involved in discussing eAgency with the prospective investors.

35.     When one of the investors questioned whether eAgency had approved the transfer, Vaccaro and Trolice dissuaded the investor from contacting eAgency by executing a promissory note, dated April 1, 2010, in the amount of $250,000 and payable to the investors, which provided reassurance that the investment was secure.

36.     Vaccaro subsequently forged an additional warrant, dated May 17, 2011, purportedly issued to Vaccaro Consultant for an additional 50,000 eAgency shares, which Vaccaro and Trolice used to solicit an additional $45,000 from several new investors in June 2011.

37.     In fact, eAgency had never issued any warrants to Vaccaro Consultant.  Vaccaro and Trolice knew, or were reckless in not knowing, that eAgency never issued any warrants to Vaccaro Consultant.

The "Vacaro Consultants" Fraudulent Scheme

38.     Vaccaro created another limited liability company, Vacaro Consultants, on May 12, 2010, for which he and Trolice solicited and raised approximately $287,500 in June 2010 from approximately 13 investors, some of whom reside in New Jersey.

39.     Vaccaro forged another warrant, purportedly entitling Vacaro Consultants to purchase 250,000 eAgency shares, and created documents dated June 4, 2010 that transferred 100% interest in Vacaro Consultants to the 13 investors.  Trolice solicited prospective investors for Vacaro Consultants, and Vaccaro was involved in discussing eAgency with the prospective investors.

40.     On June 6, 2010, Vaccaro and Trolice executed a promissory note in the amount of $300,000 payable to one of the investors on behalf of the group, which again provided purported security for the investors.

41.     In fact, eAgency had never issued any warrants to Vacaro Consultants.  Vaccaro and Trolice knew, or were reckless in not knowing, that eAgency had never issued any warrants to Vacaro Consultants.

The "Vaccaro Consultants" Fraudulent Scheme

42.     Vaccaro also solicited investors for a third limited liability company he owned and controlled, Vaccaro Consultants, even though, as discussed below, he had purportedly sold all warrants owned by Vaccaro Consultants to Trolice Consulting and he was simultaneously soliciting investors with Trolice for Trolice Consulting.  In total, Vaccaro raised approximately $1,000,000 from approximately 25 investors for Vaccaro Consultants from January 2010 to August 2014.

43.     Vaccaro solicited $250,000 of the $1,000,000 from two of the investors from

January 2010 through July 2010 even though Vaccaro Consultants held no vested warrants during that time.

44.     Although Vaccaro Consultants held vested warrants after July 2010, the dollar amount of interests Vaccaro sold in Vaccaro Consultants always exceeded the dollar amount of valid warrants held by Vaccaro Consultants.  Notwithstanding this fact, Vaccaro created documents for some investors, which falsely stated that they owned a certain number of eAgency warrants held by Vaccaro Consultants.  For example, Vaccaro gave Investor 1 a document dated August 22, 2013, which stated that $40,000 had been received from Investor 1, which entitled Investor 1 to "36,000 Eagency warrant stock options at $1.25."

45.     By email dated August 21, 2013, Vaccaro also falsely represented to Investor 1 that eAgency's patents and intellectual property had been valued at $300,000,000 by an outside firm, which was important to Investor 1's decision to invest because it signaled eAgency's future success.  In fact, eAgency has never had a valuation conducted.

46.     Vaccaro knew, or was reckless in not knowing, that the purported sales transactions in Vaccaro Consultants were a sham and that eAgency had never had a valuation conducted by an outside firm.

The "Trolice Consulting" Fraudulent Scheme

47.     From January 2009 through September 2014, Defendants collectively solicited and raised approximately $3.5 million for Trolice Consulting from more than 100 investors nationwide, at least 50 of whom reside in New Jersey.

48.     Trolice enticed prospective investors by hosting elaborate investor parties at his multi-million dollar home in Alpine, New Jersey.  During these parties for investors, Vaccaro discussed eAgency (either in person or by video-conference) and Trolice pitched the investment

opportunity in Trolice Consulting. Vaccaro's presence at the parties and his pitches gave

legitimacy to the investment because of his role as Chief Marketing Officer and Vice President

of Investor Relations at eAgency.

49.     Trolice and Vaccaro told the early investors that Trolice Consulting held eAgency

warrants that had been issued to Trolice by eAgency as compensation. Although eAgency had

issued a certain number of warrants to Trolice Consulting, as described above, beginning in

January 2011, the dollar amount of interests Trolice and Vaccaro sold in Trolice Consulting

began to surpass the dollar amount of valid warrants held by Trolice Consulting. Neither Trolice

nor Vaccaro disclosed to investors that eAgency had not given the required consent for the

transfer of any warrants to Trolice Consulting, the risk that the warrants could expire before they

were exercised at a profit, or the risk that their investments could be diluted by the sale of

additional interests in Trolice Consulting. Trolice and Vaccaro made approximately 35 separate

sales of interests in Trolice Consulting prior to January 2011, and more than 200 separate sales

of interests in Trolice Consulting after January 2011.

50.     Beginning in September 2010, and continuing for approximately two years,

Trolice falsely told prospective investors that he had purchased additional warrants from

Vaccaro, the Chief Marketing Officer of eAgency. Trolice explained that because eAgency was

a start-up company, it paid its employees primarily in non-cash compensation, such as warrants,

and that Vaccaro therefore needed to sell some of his warrants to raise money for his personal

living expenses.

51.     For example, Trolice induced investments in Trolice Consulting with the

following false statements: on September 21, 2010, Trolice sent an email to Investor 2 stating

that Vaccaro has "in excess of 1m warrants"; and, on September 23, 2010, Trolice sent an email

14

to Investor 3 stating that Vaccaro has "over 1m[illion] warrants and has put 167,500 of [his warrants] into an LLC that he will transfer to the new owners, us, of which I will control the LLC for all of us."  Contrary to Trolice's representations, Vaccaro never held anywhere near "1m[illion] warrants," and the warrants that Vaccaro did own were never transferred to Trolice Consulting.  Yet, both investors invested based on Trolice's false representations – Investor 2 invested $25,000 in Trolice Consulting on September 30, 2010, and Investor 3 invested $18,000 in Trolice Consulting on October 22, 2010.

52.     Likewise, on March 2, 2012, Trolice falsely represented to Investor 4 that "[Mackaronis] and I got $4m[illion] invested into eAgency corporate so there is no longer an ability for anyone to invest in the company except thru Lee Vaccaro, VP of investor relations, via his warrants that he transferred to my LLC."  After being told these facts, Investor 4 invested $25,000 on March 6, 2012, and an additional $20,000 on March 13, 2012, in Trolice Consulting.  In fact, Trolice made only one $50,000 investment in eAgency, and Mackaronis made no direct investments in eAgency.  eAgency also continued to solicit direct investments from accredited investors throughout the relevant period, and eAgency had even engaged Trolice for that very purpose.

53.     To perpetuate the fraudulent scheme, the following documents were fabricated by either Vaccaro or Trolice to make it appear as if Vaccaro had received additional eAgency warrants and Trolice had paid Vaccaro a total of approximately $2.8 million to purchase those warrants for Trolice Consulting:

a)     warrant subscription agreements purportedly issued by eAgency to (i) Vaccaro Consultants for 50,000 warrants to purchase eAgency common stock at $3.04 per share (dated January 1, 2011), (ii) Vaccaro Consultants for 100,000 warrants to purchase eAgency

common stock at $1.25 per share (dated July 18, 2011); (iii) Vaccaro Consultants for 50,000 warrants to purchase eAgency common stock at $1.25 per share (November 1, 2011); (iv) Vaccaro Consultants for 50,000 warrants to purchase eAgency common stock at $1.25 per share (March 26, 2012); (v) Vaccaro Consultants for 50,000 warrants to purchase eAgency common stock at $1.25 per share (July 6, 2012); and (vi) Company C, another entity owned and controlled by Vaccaro, for 100,000 warrants to purchase eAgency common stock at $1.25 per share (undated);

      b)      sale agreements dated October 26, 2010 and January 15, 2011, purporting to sell 100 percent of the interest in Vaccaro Consultants to Trolice Consulting for $300,000 and "Three Hundred Thousand Dollars ($240,000)" (typo in original), respectively;

      c)      sale agreement dated February 15, 2011, purporting to sell 100 percent of the interest in Company C to Trolice Consulting for "Three Hundred Thousand Dollars ($340,000) in cash" (typo in original);  and

      d)      amended sale agreements purporting to increase the prices of the original sales on account of the issuances to Vaccaro Consultants of unspecified numbers of additional eAgency warrants:  (i) dated August 1, 2011, for $300,000; (ii) dated November 15, 2011, for $300,000; (iii) dated March 27, 2012, for $400,000; and (iv) dated July 18, 2012, for $1,000,000.

54.      Vaccaro and Trolice knew, or were reckless in not knowing, that these purported transfers were invalid, and that the purported sales transactions were a sham:

      a)      Vaccaro, as the recipient of 340,000 legitimate warrants issued by eAgency, knew or recklessly disregarded that eAgency never issued the additional, fabricated warrants to Vaccaro Consultants or Company C;

      b)      Vaccaro knew or recklessly disregarded that the warrant subscription

16

agreements required eAgency's approval of any transfer or sale, and Vaccaro never sought or received approval from eAgency to transfer warrants to Trolice Consulting; and

        c)      Vaccaro and Trolice knew or recklessly disregarded that Trolice never made any payments to Vaccaro under these sham agreements; the only payments Trolice ever made to Vaccaro were under an arrangement to share profits of the fraudulent scheme.

     55.     Notwithstanding these facts, Vaccaro and Trolice used the fabricated documents described above to solicit investments for Trolice Consulting.  For example:

        a)      Investor 5 invested $15,000 in Trolice Consulting on January 10, 2011, after Trolice gave him a copy of the sale agreement dated January 15, 2011, purporting to sell 100 percent of the interest in Vaccaro Consultants to Trolice Consulting for "Three Hundred Thousand Dollars ($240,000)" (typo in original); and

        b)      Investor 6 invested $20,000 in Trolice Consulting on February 25, 2011, and $10,000 on September 14, 2011, after Trolice gave him copies of (i) the sale agreement dated February 15, 2011, purporting to sell 100 percent of the interest in Company C to Trolice Consulting for "Three Hundred Thousand Dollars ($340,000) in cash" (typo in original); (ii) the warrant subscription agreement purportedly issued by eAgency to Vaccaro Consultants for 100,000 warrants to purchase eAgency common stock at $1.25 per share (dated July 18, 2011); and (iii) the amended sale agreement purporting to increase the price by $400,000 of the original sales on account of the issuance to Vaccaro Consultants of unspecified numbers of additional eAgency warrants (dated August 1, 2011).

     56.     Trolice provided paperwork to some investors memorializing the dollar amount of their investment in Trolice Consulting.  However, not all investors received paperwork evidencing their investment, and the representations made in the paperwork that was received by

some investors were inconsistent.  For example, some investors received a letter from Trolice, which stated "Congratulations on investing $[X] into [Trolice Consulting/Vaccaro Consultants], which houses . . . eAgency warrants."  Other investors received a document stating that "Trolice Consulting, LLC hereby records the following ownership [listing the dollar amount of the investment]" and that "Upon liquidity event, proceeds shall be distributed to each member."

57.     Trolice made other misrepresentations to foster a false sense of confidence among prospective investors that Trolice and Vaccaro knew were false.  For example, Trolice sent an email to Investor 7 on July 3, 2012, falsely stating that he had personally invested more than $1 million in eAgency, raised $10 million for eAgency, was a member of eAgency's board of directors, and that neither he nor Trolice Consulting made any money from the sale of interests in Trolice Consulting.  Yet, in fact, Trolice made only one $50,000 investment in eAgency, raised only $1,500,000 for eAgency, was never a member of eAgency's board of directors, and misappropriated investor funds.  Trolice's representations in the July 3, 2012, email were significant for Investor 7, who invested $124,000 in Trolice Consulting just a few days later, on July 16, 2012, as the representations strongly suggested that Trolice had intimate knowledge of eAgency's operations and a real basis for believing in its prospects.

58.     Similarly, Trolice falsely told Investors 3, 5, and 6, by emails dated August 29, 2010, December 20, 2010, and February 15, 2011, respectively, that Trolice had personally invested $500,000 in eAgency and raised $3,000,000-$4,000,000 for eAgency.  Trolice also falsely told Investor 5 that he was a member of eAgency's board of directors.  Investors 3, 5, and 6 viewed these representations as significant for the same reasons as Investor 7, and each subsequently invested in Trolice Consulting, as described in paragraphs 51 and 55 above.

59.     Trolice and Vaccaro knew, or were reckless in not knowing, the actual amount

Trolice personally invested in eAgency, the actual amount he raised for eAgency in his capacity as a consultant and finder, the actual positions he held at eAgency, and the actual use he made of investors' funds – paying personal expenses, such as mortgage, college tuition, credit card, car lease, and landscaping payments.

Mackaronis' s Role in Connection with the Trolice Consulting Fraudulent Scheme

60.     Mackaronis made a personal investment of $9,000 in Trolice Consulting in February 2011. Mackaronis was a registered broker at the time and, with the hope of securing Trolice as a brokerage client, Mackaronis agreed to solicit his family members, friends, and existing brokerage clients for investments in Trolice Consulting. In exchange, Trolice agreed to pay Mackaronis commissions ranging from 10-25 percent. Over a period of more than two years, Mackaronis raised nearly $1 million for Trolice Consulting, receiving $85,000 in commissions from Trolice.

61.     Mackaronis knew very little about eAgency and the warrants purportedly held by Trolice Consulting. For example, even though Trolice Consulting was a small, unknown, private issuer of recent origin, Mackaronis never requested, prior to soliciting investors for Trolice Consulting, that Trolice or Vaccaro show him the relevant warrants from eAgency or the agreements purporting to transfer Vaccaro's warrants to Trolice Consulting. Instead, Mackaronis relied solely on the information provided to him by Trolice and Vaccaro in hyping the investment opportunity to prospective investors. Mackaronis sold prospective investors on Trolice's alleged prior successes with start-up companies and brought them to meet Vaccaro and Trolice so they could close the sales.

62.     Mackaronis also continued to solicit investors for Trolice Consulting after he had warning signals about the investment. For example, Mackaronis did not seek to learn any more

about the investment opportunity in Trolice Consulting after he became concerned about

eAgency's prospects following a visit of eAgency's office in December 2011 that showed very

little activity and after the time period in which Trolice had promised eAgency would be sold

had passed in early 2012.  Mackaronis also overlooked Trolice's warning not to discuss

Vaccaro's eAgency warrants with Vaccaro over Vaccaro's eAgency email address.  Mackaronis

knew, or should have known, that if Vaccaro was permitted to sell his eAgency warrants, it

should not have been problematic to discuss such dealings over his work email.

63.     Mackaronis was a registered broker for only a portion of the period in which he

solicited investors for Trolice Consulting, but his solicitation of investors for Trolice Consulting

was outside the scope of his employment.

**Vaccaro Defrauded Investment Advisory Clients**

64.     Vaccaro engaged in a separate fraud from November 2012 to May 2014, raising

approximately $675,000 from three advisory clients who trusted him to invest in securities on

their behalf.  Vaccaro defrauded these individuals by misappropriating their funds and making

material misrepresentations concerning their investments.

Client A

65.     Client A, who resides in Orange County, California, had made several large

investments in eAgency by the time Vaccaro began work at eAgency in mid-2009.  In his role as

Vice President of Investor Relations, Vaccaro periodically took Client A to lunch and discussed

with Client A certain corporate developments at eAgency.

66.     After several such lunch meetings, Vaccaro began to solicit Client A for money to

invest on Client A's behalf.  Vaccaro recommended that Client A allow him to purchase options

in the stock of Apple, Inc. in exchange for Vaccaro receiving 20% of the subsequent gains on the

investment. Client A agreed, and he and Vaccaro executed a one-page agreement authorizing Vaccaro to make investments in securities on Client A's behalf.

67.     Between November 13 and December 21, 2012, Client A gave Vaccaro checks made out to Vaccaro Consultants totaling $400,000 to invest on his behalf. As part of the agreement, and to provide a sense of security for Client A's investment, Vaccaro pledged as collateral "80,000 warrant stock options at $1.25" issued by eAgency to Vaccaro Consultants. However, as explained above at paragraph 28, Vaccaro Consultants did not hold any warrants as of November 2012, as eAgency had cancelled all warrants previously issued to Vaccaro Consultants on August 15, 2012, reissuing them to Company B. Within approximately 10 days of receiving each investment from Client A, Vaccaro withdrew the funds or transferred them to an account over which he had control.

68.     After receiving Client A's investment proceeds, Vaccaro emailed Client A, advising him as to the value of the Apple options he had allegedly purchased. However, Vaccaro did not send Client A any proof of the investments made on his behalf. Eventually, Vaccaro sent Client A an account statement from a brokerage firm that purported to show investments in securities that Vaccaro had made on behalf of Client A. However, the statement reflected an account held in the name of an entity that Vaccaro managed at the time, and none of the investments listed on the statement were Apple options. The statement also reflected a net portfolio value of approximately $5,000, which was significantly less than the $400,000 Client A had given to Vaccaro to invest in securities on his behalf. When Client A attempted to question Vaccaro about the account statement, Vaccaro refused to talk to him.

69.     Client A brought the investment to eAgency's attention, and eAgency fired Vaccaro on October 4, 2013, and agreed to cancel Vaccaro's warrants and reissue them to Client

A if Client A would sign an agreement releasing eAgency from any liability. Client A, Vaccaro, and eAgency executed the settlement agreement, effective November 25, 2013.

70.     Vaccaro did not invest in Apple options, and instead diverted all of Client A's funds for personal use.

Client B

71.     Client B resides in Orange County, California and owns and operates a residential construction and remodeling company.

72.     Client B plays poker and met Vaccaro at a poker game. Vaccaro frequently bragged about his success at investing and solicited Client B to give him money so Vaccaro could invest it in securities for him. Client B agreed to do so, and on February 14, 2014, Client B gave Vaccaro a check for $100,000 to invest without restriction in exchange for Vaccaro receiving 20% of the profits.

73.     Shortly thereafter, Vaccaro reported to Client B that his investment was "up" by 25%, to $125,000, and suggested that Client B roll the money over to Vaccaro Consultants, which Vaccaro claimed held eAgency warrants. Vaccaro described eAgency and touted its prospects, so Client B agreed to invest the $125,000 in Vaccaro Consultants, plus an additional $125,000 on May 5, 2014. Client B made the $125,000 investment by check to Company B, as he was instructed to do by Vaccaro; however, Client B understood from Vaccaro that the investment was to purchase eAgency warrants held by Vaccaro Consultants or to purchase an interest in Vaccaro Consultants, which purportedly held eAgency warrants.

74.     In or about the same time that Client B invested $250,000 in Vaccaro Consultants, Vaccaro withdrew approximately $180,000 in cash and transferred the remaining funds to another bank account he controlled. During this period, Vaccaro spent approximately $253,000

at Las Vegas casinos.

75.     Vaccaro did not invest in any securities on behalf of Client B, and instead diverted Client B's funds for personal use.

Client C

76.     Even after Vaccaro learned that he was the subject of civil and criminal investigations, Vaccaro continued to act as an investment adviser, soliciting a $25,000 investment from Client C, a woman residing in North Dakota, on July 13, 2015, in exchange for Vaccaro receiving 15% of the subsequent gains on the investment.

77.     In September and December, 2015, Vaccaro sent Client C "account statements" in an Excel spreadsheet format falsely indicating that he had purchased Tesla Motors and Facebook call options for her account, and that, as of December 15, 2015, Client C's account was up by 75%. Vaccaro, however, did not include any trade confirmations or brokerage statements, which demonstrated that he had actually placed these trades.

78.     Vaccaro has refused to return Client C's investment, despite numerous requests since early January 2016, and notwithstanding the provision in their agreement that "[Client C] may cash out of investment at any time."

**FIRST CLAIM FOR RELIEF**
**Violations of, and Aiding and Abetting Violations of,**
**Section 17(a) of the Securities Act**
**(Trolice and Vaccaro)**

79.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

80.     Trolice and Vaccaro, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, knowingly or recklessly have: (a) employed devices,

schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements

of a material fact or omissions of a material fact necessary in order to make the statement made,

in light of the circumstances under which they were made, not misleading; and/or (c) engaged in

transactions, practices, or courses of business which operated or would operate as a fraud or

deceit upon the purchaser.

81.     By reason of the foregoing, Trolice and Vaccaro, directly or indirectly, singly or

in concert, have violated, and unless enjoined, will again violate Section 17(a) of the Securities

Act [15 U.S.C. § 77q(a)].

82.     In the alternative, Trolice and Vaccaro, directly or indirectly, provided knowing

and substantial assistance to each other, who, directly or indirectly, singly or in concert, in the

offer or sale of securities and by use of the means or instruments of transportation or interstate

communication in interstate commerce or by the use of mails, knowingly or recklessly have: (a)

employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of

untrue statements of a material fact or omissions of a material fact necessary in order to make the

statements made, in light of the circumstances under which they are made, not misleading;

and/or (c) engaged in transactions, practices, or courses of business which operated or would

operate as a fraud or deceit upon the purchaser.

83.     By reason of the foregoing, Trolice and Vaccaro aided and abetted, and unless

enjoined, will again aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

### SECOND CLAIM FOR RELIEF
**Violation of, and Aiding and Abetting Violations of,**
**Section 10(b) of the Exchange Act and Rule 10b-5**
**(Trolice and Vaccaro)**

84.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 78, as if fully set forth herein.

85.     Trolice and Vaccaro, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.     By reason of the foregoing, Trolice and Vaccaro, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

87.     In the alternative, Trolice and Vaccaro, directly or indirectly, provided knowing and substantial assistance to each other, who, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; and/or (c) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

88.     By reason of the foregoing, Trolice and Vaccaro aided and abetted, and unless enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### THIRD CLAIM FOR RELIEF
#### Violation of Section 17(a)(3) of the Securities Act
#### (Mackaronis)

89.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

90.     Mackaronis, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

91.     By reason of the foregoing, Mackaronis, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

### FOURTH CLAIM FOR RELIEF
#### Violations of Sections 5(a) and 5(c) of the Securities Act
#### (All Defendants)

92.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

93.     The interests in the LLCs offered and sold by Trolice, Vaccaro, and Mackaronis constitute "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

94.     At all relevant times, the interests in the LLCs that Trolice, Vaccaro, and Mackaronis offered and sold were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

95.     Trolice, Vaccaro, and Mackaronis, therefore, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

96.     By reason of the foregoing, Trolice, Vaccaro, and Mackaronis, directly or indirectly, singly or in concert, have violated, and unless enjoined, will again violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## FIFTH CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act
### (All Defendants)

97.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraph 1 through 78, as if fully set forth herein.

98.     Trolice, Vaccaro, and Mackaronis, while engaged in the business of effecting transactions in securities for the account of others made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

99.     Trolice, Vaccaro, and Mackaronis have violated, and unless enjoined, and restrained will again violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### SIXTH CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Vaccaro)

100.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

101.    Vaccaro at all relevant times was an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

102.    As an investment adviser, Vaccaro owed Client A, Client B, and Client C fiduciary duties of utmost good faith, fidelity, and care to, among other things, make full and fair disclosure to it of all material facts, as well as a duty to act in the best interests of Client A, Client B, and Client C and not to act in his own interests to the detriment of Client A, Client B, and Client C.

103.    During the relevant period, Vaccaro, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, while acting as investment advisers, knowingly or recklessly: (1) employed devices, schemes, or artifices to defraud clients or prospective clients; or (2) engaged in transactions, practices, and courses of business that operated as a fraud or deceit upon clients or prospective clients.

104.    By reason of the foregoing, Vaccaro breached his fiduciary duties to Client A, Client B, and Client C and has otherwise violated, and unless enjoined, will again violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently enjoining each of the Defendants from committing, aiding and abetting or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this complaint.

## II.

Ordering each of the Defendants to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts, including ordering Trolice and Vaccaro jointly and severally liable for each other's ill-gotten gains in connection with the offering fraud involving eAgency warrants purportedly held by the LLCs.

## III.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and ordering Vaccaro to pay civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## IV.

Ordering Trolice and Vaccaro barred from serving as an officer and director pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York
       May 4, 2016

                              Respectfully submitted,


                        By:   _____
                              Andrew M. Calamari*
                              Sanjay Wadhwa*
                              Sheldon L. Pollock*
                              Kevin McGrath*
                              Kristin M. Pauley*
                              Ann Marie Preissler*
                              *Attorneys for Plaintiff*
                              U.S. Securities and Exchange Commission
                              New York Regional Office
                              200 Vesey Street, Suite 400
                              New York, New York 10281-1022

                              Phone:  (212) 336-0533 (McGrath)

                              * Not admitted in New Jersey

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the

foregoing Complaint is not the subject of any other action pending in any court, or of any

pending arbitration or administrative proceeding.

Andrew M. Calamari
Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0042

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), because the U.S. Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above-captioned action.  Therefore, service upon the United States or its authorized designee, Leticia B. Vandehaar, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, Suite 700, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

Andrew M. Calamari
Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0042